IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

v.                                                          Criminal No. 3:22cr180 (DJN)

KENDRICK LAMAR DIGGS,
　　　　Petitioner.

**MEMORANDUM OPINION**

Kendrick Lamar Diggs, a federal inmate proceeding *pro se*, submitted this motion under

28 U.S.C. § 2255 to vacate, set aside, or correct his federal conviction and sentence. ("§ 2255

Motion," ECF No. 70).[1]  The Government opposes the § 2255 Motion, arguing that its claims are

without merit.  (ECF No. 72.)  Although Diggs did not file a response, he did file a Motion to

Amend the § 2255 Motion, seeking to add a new claim not contained in his original submission.

("Motion to Amend," ECF No. 76.)  For the reasons set forth below, although Diggs's Motion to

Amend will be GRANTED, the § 2255 Motion will be DENIED.

## I.　　PROCEDURAL HISTORY

### A.　　Indictment and Guilty Plea

On December 6, 2022, a grand jury returned a one-count Indictment charging Diggs with

possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g).  (ECF No. 1

at 1.)  On May 5, 2023, the Court held a final pretrial conference.  (*See* ECF Nos. 18, 30.)  Later

the same day, Diggs appeared before the Court, represented by Attorney Jeffrey L. Everhart, to

enter a guilty plea consistent with a Plea Agreement he had reached with the Government.  (ECF

---

[1]　　The Court employs the pagination assigned to the parties' submissions by the CM/ECF
docketing system.  The Court corrects the spelling, punctuation and capitalization in quotations
from Diggs's submissions.

Nos. 30, 33.) The Plea Agreement — which Diggs certified that he had "read . . . and carefully reviewed . . . with [his attorney]" and was entering into "voluntarily," (ECF No. 33 at 12) — clearly stated that Diggs was "waiv[ing] the right to appeal the conviction and any sentence within the statutory maximum . . . on any ground whatsoever other than an ineffective assistance of counsel claim that is cognizable on direct appeal." (*Id.* at 3.) Moreover, it stated that Diggs was "satisfied that [his] attorney ha[d] rendered effective assistance." (*Id.* at 2.)

In the Statement of Facts that accompanied the Plea Agreement, Diggs agreed that if the matter had proceeded to trial, "the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence" (ECF No. 34 at 1):

1. On or about August 8, 2022, in the Eastern District of Virginia, the defendant, knowing that he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm, to wit: an Anderson Manufacturing, Model AM-15 rifle, bearing Serial Number 17114708, that had been shipped and transported in interstate or foreign commerce, in violation of 18 U.S.C. § 922(g)(1).

2. The penalties for this offense are a maximum term of 15 years of imprisonment, a fine of $250,000, forfeiture of assets as outlined below, a special assessment pursuant to 18 U.S.C. § 3013, and a supervised release term of 3 years. The defendant understands that any supervised release term is in addition to any prison term the defendant may receive, and that a violation of a term of supervised release could result in the defendant being returned to prison for the full term of supervised release.

. . . .

5. On August 8, 2022, law enforcement received a 911 call advising that the defendant, KENDRICK LAMAR DIGGS, was in possession of a firearm and was driving a black convertible.

6. Law enforcement located DIGGS who was driving a two-door black car with a convertible top in the area of Light Street, headed towards Brown Store Market in Northumberland County. The defendant stopped and as law enforcement approached the car, one officer noticed what appeared to be a firearm in the vehicle. Moments later, DIGGS drove off on Beanes Road, in excess of 80 miles per hour. He was being followed by law enforcement who had their lights and sirens on.

7. As DIGGS attempted to pass an oncoming vehicle, he turned the wheel to the left side of the road, hit the culvert, and flipped the vehicle multiple times before running from it, and into a wooded area at which time he was apprehended by law enforcement.

8.      The Anderson Manufacturing AM-15 rifle, bearing Serial Number 17114708 was recovered near the front of the residence where DIGGS had crashed his vehicle.  Furthermore, multiple parts of the Anderson firearm, as well as numerous rounds of ammunition were recovered in the debris field in front of the residence, and in close proximity to DIGG[S]'s vehicle.

9.      The defendant stipulates and agrees that at the time he possessed the firearm he knew that he had been previously convicted of a crime punishable by a term of incarceration exceeding one year (i.e., a felony), and that he knowingly possessed the Anderson Manufacturing rifle bearing Serial Number 17114708.

10.      The parties further stipulate and agree that the firearm referenced in this Statement of Facts and in Count One of the pending indictment is a firearm within the meaning of the law in that it is designed to expel a projectile by means of an explosive.

11.      The parties further stipulate and agree that the firearm referenced in the pending indictment and set forth in this Statement of Facts had been shipped and transported in interstate or foreign commerce in that the firearm was manufactured outside the Commonwealth of Virginia.

(ECF No. 34 at 1–2.)

Throughout a Rule 11 hearing on May 5, 2023, the Court engaged with Diggs and his attorney to ensure that Diggs's plea was knowing, intelligent, and voluntary, that Diggs understood the nature and consequences of pleading guilty, and that Diggs's choice to plead guilty was his alone.  The following relevant exchanges occurred:

> THE COURT:      So, Mr. Diggs, they tell me you want to plead guilty now. Is that true?
>
> THE DEFENDANT:  Yes, sir.
>
> THE COURT:      You're doing that of your own free will?
>
> THE DEFENDANT:  Yes, sir.
>
> THE COURT:      All right.  I'm going to ask you several questions.  These questions are designed to ensure that you understand exactly what you're doing here today.  I want you to know you have been placed under oath and, therefore, you have an affirmative responsibility to tell the truth.  And if for any reason you did not tell the truth, you could face additional punishment for perjury and imprisonment of up to five years for that.  Do you understand that?
>
> THE DEFENDANT:  Yes, sir.

3

THE COURT:        I also want you to know that if you want to speak with your lawyer all you have to do is let him know or let me know and I'll immediately stop and give you all the time that you want to speak with your lawyer. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT:        I also want you to know that you can decide to change your mind, and you can do so for any reason that you want up until the point that I accept your guilty plea, and until then, you would not be penalized in any way. But after I accept your guilty plea, you would only be allowed to try to change your mind for what is known as a fair and just reason, which is a pretty difficult standard to meet.

So let's say, for example, if I accept your guilty plea, we're going to schedule your case for sentencing on September the 26th. I gather you understand by now that I would be the guy who would decide your fate. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT:        Look, I told you before, this morning, I have no idea what your sentence would be. First of all, you were presumed innocent, but secondly, all I know about this case is what the lawyers have told me so far, right? So I have no idea what your sentence is going to be. I can honestly tell you that right now.

But let's say, hypothetically, you get a sentence that's a little bit harsher than what you thought you were going to get. It's too late then to raise your hand and say, "Hey, Judge Novak, I don't want to plead guilty anymore because I don't like that sentence you gave me."

The concept behind today is that I ask you all these questions to make sure you understand exactly what you're getting yourself into. So, as I said, up until the point that I accept your guilty plea, you can change your mind for any reason and you won't be penalized. But after I accept your guilty plea, you would only be allowed to try to change your mind, and you do that by moving to withdraw your guilty plea. You would only be allowed to do that for what is known as a fair and just reason, which, as I just told you, is a pretty difficult standard to meet. Do you understand all that?

THE DEFENDANT: Yes, sir.

THE COURT:        All right. Now, are you the Kendrick Lamar Diggs who's identified in the indictment?

THE DEFENDANT: Yes, sir.

THE COURT:        How old are you, sir?

THE DEFENDANT: 31.

THE COURT:        Can you keep your voice up a little bit for me?

4

THE DEFENDANT: Sure.

THE COURT:    How far did you go in school?

THE DEFENDANT: I graduated.

THE COURT:    From where?

THE DEFENDANT: High school diploma from Lancaster County.

THE COURT:    Okay. So does that mean you're able to read, write, and understand the English language?

THE DEFENDANT: Yes, sir.

THE COURT:    Have you had any alcohol to drink in the last 24 hours?

THE DEFENDANT: No, sir.

THE COURT:    Have you taken any drugs, either illegal drugs or prescription medicine, within the last 24 hours?

THE DEFENDANT: No, sir.

THE COURT:    No medicine at all?

THE DEFENDANT: No, sir.

THE COURT:    Okay. So, then, are you currently under the influence of any substance at this time, be it alcohol, prescription drugs, or illegal drugs?

THE DEFENDANT: No, sir.

THE COURT:    All right. Have you ever been treated in the past for any type of mental or emotional disorder?

THE DEFENDANT: Yes, sir.

THE COURT:    What have you been treated for?

THE DEFENDANT: PTSD.

THE COURT:    Okay. When were you treated for that?

THE DEFENDANT: Back around 2015.

5

THE COURT:        Okay.  What did that treatment consist of?

THE DEFENDANT: I just was taking meds.

THE COURT:        Okay.  And you stopped taking those at some point?

THE DEFENDANT: Yes, sir.

THE COURT:        How long ago did you stop taking those?  Over a year ago?

THE DEFENDANT: Yes, sir.

THE COURT:        Okay.  And you don't receive any treatment now?

THE DEFENDANT: Yes.  Now I've started back, yes.

THE COURT:        Okay.  I need you to keep your voice up a little bit for me.

THE DEFENDANT: Yeah.  I started back taking meds now.

THE COURT:        Okay.  So when was the last time you took some meds?

THE DEFENDANT: It was this morning.

THE COURT:        Oh, so you did take some medicine today?

THE DEFENDANT: Yeah.

THE COURT:        It's okay.  We're going to take our time.  Listen, this day is for you.  This day is for you to understand exactly what's going on.  Are you with me on this?

THE DEFENDANT: Yes, sir.

THE COURT:        So we're going to take our time, just relax, all right?  What kind of medication did you take today?

THE DEFENDANT: Seroquel, and I'm not sure -- I'm not sure of all the meds I'm taking.

THE COURT:        How many medications did you take this morning?

THE DEFENDANT: Three.

THE COURT:        Is that what you take on a daily basis?

6

THE DEFENDANT:  Yes, sir.

THE COURT:      Are they all for your PTSD?

THE DEFENDANT:  Yes, sir.

THE COURT:      Okay.  Now, here's what the key question is:  What is the impact of the medicine on you?  What does it do for you?  Does it stabilize your mood?

THE DEFENDANT:  Yeah.  Yes, sir.

THE COURT:      Okay.  Does it in any way prevent you from understanding me?

THE DEFENDANT:  No, sir.

THE COURT:      Does it prevent you in any way from understanding your lawyer?

THE DEFENDANT:  No, sir.

THE COURT:      You've been able to communicate with him adequately?

THE DEFENDANT:  Yes, sir.

THE COURT:      So, Mr. Everhart, now, you've been representing Mr. Diggs for a while; is that right?

MR. EVERHART:   Yes, sir.

THE COURT:      I know you've met with him a number of times, and I gather you've spent some time with him now this morning even after our hearing; is that right?

MR. EVERHART:   I have.

THE COURT:      Is there anything about his mental health treatment that you believe has impaired his ability to understand you or to communicate with you?

MR. EVERHART:   No.

THE COURT:      Do you think there's any reason why I can't move forward?

MR. EVERHART:   No.

7

THE COURT:    You've obviously represented other folks with similar mental health issues; is that right?

MR. EVERHART:    Yes, sir.

THE COURT:    So you believe he's competent and fully able to move forward; is that right?

MR. EVERHART:    Yes, sir.

THE COURT:    And I think he's been fairly -- appropriately responsive to all my questions.

MR. EVERHART:    Absolutely.  Yes.

THE COURT:    If you don't understand something, will you promise to let me know?

THE DEFENDANT: I do.

THE COURT:    Okay.  Have you ever been treated for addiction?

THE DEFENDANT: I took an AA class.

THE COURT:    Okay.  When was that?

THE DEFENDANT: Back in 2015.

THE COURT:    All right.  Nothing recent, though; is that right?

THE DEFENDANT: No, sir.

THE COURT:    Now, have you received a copy of the charge against you?

THE DEFENDANT: Yes, sir.

THE COURT:    And have you reviewed it with your lawyer?

THE DEFENDANT: Yes, sir.

THE COURT:    Now, do you understand what you've been charged with, which is possession of a firearm by a convicted felon?  Do you understand that?

THE DEFENDANT: Yes, sir.

8

THE COURT: Now, if this case had gone to trial, as we were planning to do next week, what the government would have to prove beyond a reasonable doubt is that you were a convicted felon; you knew you were a convicted felon, therefore, you're not able to possess a firearm; you possessed a firearm here -- I think it was a rifle -- and that rifle had traveled at some point in interstate commerce, meaning it's always that it was made somewhere outside of Virginia and was brought here. Do you understand that that's what they would have to prove beyond a reasonable doubt?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand the maximum punishment for this is up to 15 years in prison, a fine of up to $250,000, you would -- you've already agreed to forfeit the rifle -- a special assessment of $100, and a term of supervised release of up to three years. Do you understand that's the maximum punishment?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand that this charge involves a felony, and, therefore, by pleading guilty to this charge, you'll be surrendering valuable civil rights? So, for example, you would lose the right to vote, lose the right to hold public office, and lose the right to own and possess a firearm. Do you understand those consequences?

THE DEFENDANT: Yes, sir.

THE COURT: Now, are you a citizen of the United States?

THE DEFENDANT: Yes, sir.

THE COURT: I ask because, if you were not, this could lead to you being deported.
Has anybody threatened you to plead guilty here?

THE DEFENDANT: No, sir.

THE COURT: Now, you changed your mind from a little bit before until now, right, so after our hearing today? I just want to make sure that you did that on your own volition, that it was your decision. Am I right about that?

THE DEFENDANT: Yes, sir.

THE COURT: Did anybody pressure you in any way?

THE DEFENDANT: No, sir.

THE COURT: Now, have you had enough time to talk with Mr. Everhart not just about the charge but also the facts of your case?

THE DEFENDANT: Yes, sir.

THE COURT:     Did you also talk to him about whether it was a good idea to go to trial versus pleading guilty?

THE DEFENDANT: Yes, sir.

THE COURT:     And, ultimately, it was your decision to decide to plead guilty?

THE DEFENDANT: Yes, sir.

THE COURT:     I think you have a written plea agreement with the government. Am I right about that?

THE DEFENDANT: Yes, sir.

THE COURT:     And did you sign that document?

THE DEFENDANT: Yes, sir.

THE COURT:     Now, before you signed it -- we're going to come back to that in a few moments, but before you signed that document, did you review that with Mr. Everhart?

THE DEFENDANT: I did.

THE COURT:     Did you have enough time to do so?

THE DEFENDANT: Yes, sir.

THE COURT:     Now, this morning we had a discussion about the sentencing guidelines. Did he go over those sentencing guidelines with you?

THE DEFENDANT: Yes, sir.

THE COURT:     Now, I know that Mr. Everhart has done that because he's a fine lawyer. But because they play such an important role in your fate, I thought I would go over that process with you as well, just to make sure you and I are on the same page. Is that okay with you?

THE DEFENDANT: Yes, sir.

. . . .

10

THE COURT:          Now, Mr. Diggs, when Mr. Everhart went over that with you, it is quite likely and quite appropriate for him to give you a prediction, and I'm stressing the word "prediction," of what he thinks your sentencing guideline range could be and, perhaps, even what your sentence could ultimately be.  Am I right about that?

THE DEFENDANT:  Yes, sir.

THE COURT:          What I want you to understand is it is a prediction, not a promise.  Nobody in the planet can promise you here today what your sentence is going to be.

That's really true for two reasons.  First of all, that very important sentencing guideline process that I just explained to you, you being interviewed, they write the report and all that stuff, none of that has happened yet, right?

THE DEFENDANT:  No, sir.

THE COURT:          Okay.  The second thing is, as I told you, the guy who's going to decide your fate is me.  And I can honestly tell you as I'm sitting here right now that I don't know what your sentence is going to be yet because we haven't gone through the process, I haven't heard from the lawyers, and the last person I hear from is you, right?  Then I make my decision, right?

So my point is, if I don't know what the sentence is going to be, how can anybody else know what the sentence is going to be.  Does that make sense to you?

THE DEFENDANT:  Yes, sir.

THE COURT:          So what I want you to understand again is, anything that Mr. Everhart or even Ms. Miller or anybody else has told you about the sentence, I want you to understand it's going to be a prediction, not a promise.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:          So I'm going to ask you:  Has anybody promised you, then, what your sentence would be?

THE DEFENDANT:  No, sir.

THE COURT:          Now, are you satisfied with all the work that Mr. Everhart has done for you?

THE DEFENDANT:  Yes, sir.

THE COURT:          Do you believe he's done everything necessary to allow you to make the important decision about whether or not to plead guilty here today?

THE DEFENDANT:  Yes, sir.

THE COURT:        Did you ask him to perform any tasks that he did not perform?  Did he do everything you wanted him to do?

THE DEFENDANT:  Yes, sir.

THE COURT:        And you're happy with him?

THE DEFENDANT:  Yeah.

THE COURT:        All right.  Now, do you understand, though, that regardless of how good a lawyer he is, and regardless of his advice to you, still at the end of the day it is your decision and your decision alone about whether or not to plead guilty, for it is you who faces the consequence of this guilty plea, not him?  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:        Do you understand that you have an absolute right to plead not guilty and demand that the government prove each and every element of this offense that you're charged with beyond a reasonable doubt?  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:        Do you understand that you have the right to make this matter go to trial even if you think you're guilty?  Do you understand this?

THE DEFENDANT:  Yes, sir.

THE COURT:        Do you understand that by pleading guilty, then, you're giving up your right to a trial?  So our trial that we were going to have next week is going to be canceled; there won't be any trial.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:        So all that will be left will be sentencing.  As I told you, we'll have that on September the 26th.

So because you're giving up your right to a trial, you're giving up the rights that come along with a trial.  So, for example, as I said, you would have the right to plead not guilty, receive a speedy and public trial with the assistance of counsel.  You would have the right to see and hear all the evidence against you, and you would have the right to confront and cross-examine all witnesses against you.  You would also have the right to use the power and the process of this court to be able to present evidence on your own behalf if you so choose.

And all I mean by that is this:  If you wanted to call a witness to come testify and they didn't want to come testify, we would issue a subpoena and we would make them testify.  Do you understand me so far?

THE DEFENDANT: Yes, sir.

THE COURT: Of course, you have no obligation to present any evidence. You could testify at your own trial if you wanted, or, as I told you this morning, you could elect to remain silent based upon your constitutional right to do so. And if you elected to remain silent, the Court would instruct the jury and otherwise ensure that nothing could be concluded from the fact that you chose to remain silent by exercising your constitutional right to do so. Do you understand all that?

THE DEFENDANT: Yes, sir.

THE COURT: You would have the right to a jury trial. A jury trial would consist of 12 fellow citizens of the community. You'd have the right to help select them, and they would be told that they would have to be unanimous. In other words, all 12 of them would have to agree that the government has proved your guilt beyond a reasonable doubt. Do you understand all that?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand that by pleading guilty you're admitting all the essential elements of this offense, you're giving up all these rights that I just explained to you, and you're saying, in effect, that you committed this crime and you may never again say that you did not do it. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand it also means you're admitting not only you did what the government says you did, but also that they could prove it beyond a reasonable doubt? Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Are you intending to plead guilty to this charge because you're, in fact, guilty of what the government says you did?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Let's talk about the plea agreement. You said you signed it there; is that right?

THE DEFENDANT: I did.

THE COURT: What page did you sign it?

THE DEFENDANT: 11.

13

THE COURT:        Did your lawyer sign it?

THE DEFENDANT: Yeah, he signed it too.

THE COURT:        What page?

THE DEFENDANT: 11.

THE COURT:        Now, before you signed it, did you review that with him?

THE DEFENDANT: Yes, sir.

THE COURT:        Did you understand everything contained in that document?

THE DEFENDANT: Yes, sir.

THE COURT:        Now, let me ask you this:  The reason it's called a plea agreement is because you've agreed to do some things, the Government has agreed to do some things, right?  You made promises to each other.  Has anybody made any promises to you to get you to plead guilty that's not in that document?

THE DEFENDANT: No, sir.

THE COURT:        So all promises made are in the document, then; is that right?

THE DEFENDANT: Yes, sir.

THE COURT:        Now, the written agreement controls, but I'm going to go over the highlights just to make sure you and I are on the same page about what you've agreed and what the Government has agreed.  Is that okay with you?

THE DEFENDANT: Yes, sir.

THE COURT:        Now, as I said before, you agree to plead guilty to Count One.  That charges you with possession of a firearm by a convicted felon[].  The maximum punishment for that is up to 15 years in prison, a fine up to $250,000, you've agreed to forfeit the rifle that was at issue, a special assessment of $100, and a term of supervised release up to three years.  Am I correct about that?

THE DEFENDANT: Yes, sir.

THE COURT:        Now, you have agreed to waive, which means give up, your right to appeal any sentence that occurs within the statutory maximum, but the

14

Government has not given up their right to appeal. So if they don't like the sentence, they can appeal but you cannot. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT:        The Government has agreed not to further prosecute you in this district for any of the conduct that's identified in the indictment or the statement of facts with the exception of any crimes of violence that are not specifically charged. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT:        You have agreed to forfeit the rifle. In fact, I've already signed the order on that. Am I right about that?

THE DEFENDANT: Yes, sir.

THE COURT:        To me, that's your deal with the Government. Did I miss anything?

THE DEFENDANT: No.

THE COURT:        Any other promises been made to you that I haven't gone over?

THE DEFENDANT: No, sir.

THE COURT:        All right. Now, I think you also have a statement of facts there too; is that right?

THE DEFENDANT: Yes, sir.

THE COURT:        Did you sign that document?

THE DEFENDANT: Yes, sir.

THE COURT:        What page?

THE DEFENDANT: Page 5.

THE COURT:        Did your lawyer sign it?

THE DEFENDANT: Yes, sir.

THE COURT:        What page?

15

THE DEFENDANT: 5.

THE COURT:        Now, before you signed it, did you review that document?

THE DEFENDANT: Yes, sir.

THE COURT:        Did you understand everything contained in that document?

THE DEFENDANT: Yes, sir.

THE COURT:        And does that document fairly and accurately represent the crime that you committed?

THE DEFENDANT: Yes, sir.

THE COURT:        All right.  I'm going to accept that as an adequate basis of fact.

Mr. Everhart, I'm going to turn to you . . . .

Are you satisfied that the defendant fully understands the charge against him?

MR. EVERHART:    Yes, Your Honor.

THE COURT:        Are you satisfied he has been competent and fully able to cooperate with you throughout the course of this matter?

MR. EVERHART:    Yes, sir.

. . . .

THE COURT:        To the best you're able, are you satisfied that he is currently not under the influence of any drugs, alcohol, or medication today?

MR. EVERHART:    I am.

THE COURT:        And that includes that medication that he's taking for the PTSD; is that right?

MR. EVERHART:    Yes, Your Honor.

THE COURT:        And, again, you would agree with me he's been properly responsive throughout this proceeding?

MR. EVERHART:    Yes, sir, and with me when I met with him earlier today.

THE COURT:        Okay.  So do you know of any reason why the Court should not now accept his guilty plea?

16

MR. EVERHART:    No, Your Honor.

THE COURT:        Mr. Diggs, now is the time.  Do you still want to plead guilty?

THE DEFENDANT:  Yes, sir.

(ECF No. 59 at 4–27.)

### B.        Motion to Dismiss

On October 3, 2023, Diggs moved to dismiss the Indictment, citing *New York State Rifle & Pistol Assoc., Inc. v. Bruen*, 597 U.S. 1 (2022), and arguing that the charge against him violated his rights under the Second Amendment.  (ECF No. 48.)  On October 12, 2023, the Court denied Diggs's motion to dismiss, citing its previous denial of relief to a defendant who raised an argument that was "substantially identical to" Diggs's.  (ECF No. 50.)

### C.        Sentencing

Also on October 12, 2023, the Court held a sentencing hearing.  (ECF Nos. 52, 60.)  There, both the Government and Diggs moved for variances — the Government's upward, and Diggs's downward.  (*See* ECF No. 60 at 2–3.)

In granting the Government's motion for an upward variance, the Court highlighted the dangerous nature of the offense, noting that Diggs was in possession of a firearm and ammunition while involved in a high-speed chase that concluded in Diggs's vehicle flipping multiple times.  (*See id.* at 24.)  The Court also examined Diggs's criminal record — which included a charge for attempted murder — and found it to be "atrocious" and indicative that Diggs posed a danger to the community.  (*Id.* at 24–25.)  The Court next found that that an upward variance was required for the sentence to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; to "afford adequate

deterrence to criminal conduct"; to "protect the public from future crimes of the defendant"; and would permit Diggs an opportunity to receive "needed educational or vocational training, medical care or other correctional treatment in the most effective manner." (*Id.* at 25.)

Taking all of these factors into account and determining that an upward variance was appropriate, the Court then sentenced Diggs to 108 months of incarceration. (*Id.* at 26; ECF No. 52 at 2.) Although Diggs filed a Notice of Appeal, (ECF No. 54), he later moved to voluntarily dismiss his appeal, a request that the Fourth Circuit granted on April 16, 2024. (ECF No. 61).

### D.    Claims for Relief and Motion to Amend

On March 10, 2025,[2] Diggs filed the § 2255 Motion, raising the following claims:

Claim One    "Ineffective Counsel"

"Movant told counsel he wanted to go to trial, [and] counsel coerced movant not to. By refusing to put in several motions to suppress [ ] a key statement by a FBI agent, also [ ] a 911 call that was hearsay. Which both were key elements. The FBI agent stated he [had] seen what appeared to be a long gun in between the driver's seat and middle console, but failed to put that in his initial statement. That's key because the gun they recovered had no fingerprints or DNA. Counsel of movant then advised movant to take an unintelligent plea, which waived movant's rights to appeal his conviction & sentencing also the manner in which they were given. Counsel also based my direct appeal on issues that movant's plea said he couldn't challenge. A plea that movant's counsel advised him was in his best interests." (ECF No. 70 at 5.)

Claim Two    "Violation of my Second Amendment Right"

"The District Court erred in denying movant's motion to dismiss the indictment for a [§] 922(g) [charge], which is in violation of movant's Second Amendment [rights]." (*Id.* at 6.)

---

[2]    Although the Court did not receive it until later, March 10, 2025 is the date that Diggs certifies that he placed the § 2255 Motion in his institutional mailing system. (ECF No. 70 at 13.) The Court credits this date as the § 2255 Motion's date of filing. *See Houston v. Lack*, 487 U.S. 266, 276 (1988).

18

Claim Three    "Violation of Due Process"

"The District Court also erred in imposing a sentence that is longer than necessary to achieve the goals of 18 U.S.C. § 3553, in violation of movant's right to due process. The court[] also erred in denying a well-deserved downward variance, and granted a[n] upward variance while repeatedly asserting essentially that it did not want to appear to be sentencing movant in accordance with the enhancement it just had overruled. The court's decision to grant the upward variance finds no support in the evidence presented." (*Id.* at 8.)

Claim Four    "Fair and just reason / defective plea"

"The reason I said fair & just reason is because I took medication that altered my decision making, which was to agree to a defective plea." (*Id.* at 9.)

On July 8, 2025, the Government filed its Opposition to the § 2255 Motion. (ECF No. 72.) Diggs did not file any response, but he later filed a Motion to Amend, raising the following additional claim:

Claim Five    "Congress[ ] unconstitutional[ly] interpreted/enacted 18 U.S.C. [§] 922(g)(1)'s 'felon-in-possession' violated Mr. Digg's [Second] Amendment right, i.e., this Court's/government's lacked subject-matter jurisdiction. 18 U.S.C. [§] 3231." (ECF No. 76 at 3.)

As discussed below, although the Court will grant Diggs's Motion to Amend, his claims are without merit, and his § 2255 Motion will therefore be DENIED.

## II.    ANALYSIS

### A.    Motion to Amend

The Court begins its analysis by addressing Diggs's Motion to Amend. Diggs filed this motion outside of the one-year limitation period under Section 101 of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2255(f), and does not claim or demonstrate any entitlement to a belated commencement of the limitation period under 28 U.S.C. § 2255(f)(2)–(4) or equitable tolling. *United States v. Sosa*, 364 F.3d 507, 512 (4th Cir. 2004)

19

(quoting *Rouse v. Lee*, 339 F.3d 238, 246 (4th Cir. 2003)).  As a result, the Court can consider Claim Five — the new claim raised in the Motion to Amend — only if it relates back to the claims in Diggs's original § 2255 Motion.

Courts apply Rule 15 of the Federal Rules of Civil Procedure to motions to amend § 2255 motions.  *United States v. Pittman*, 209 F.3d 317, 317 (4th Cir. 2000).  Rule 15 allows for amendments to a § 2255 motion filed after the one-year statute of limitations, provided the amendment relates back to the original timely filed motion.  *Id.*  A claim relates back if it "arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading." Fed. R. Civ. P. 15(c)(1)(B).  An amended claim "does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Mayle v. Felix*, 545 U.S. 644, 650 (2005).  It is not sufficient that the new claim simply "has the same form as the original claims," if the new claim "arises out of wholly different conduct." *Pittman*, 209 F.3d at 318.

Here, the Court is satisfied that Claim Five relates back to the original § 2255 Motion. There, in Claim Two, Diggs challenged the Court's decision to deny his Motion to Dismiss, which contested the constitutionality of 18 U.S.C. § 922(g).  (ECF No. 70 at 6.)  In proposed Claim Five, Diggs raises essentially the same argument, claiming that Congress overstepped its constitutional authority in enacting the statute.  (ECF No. 76 at 3–10.)  Because at the core of each claim Diggs contests the constitutionality of § 922(g), the Court concludes that Claim Five "ar[ises] out of the conduct, transaction, or occurrence set out . . . in the original pleading" and therefore relates back.  Fed. R. Civ. P. 15(c)(1)(B); *see Mayle*, 545 U.S. at 646 ("[R]elation back depends on the existence of a common core of operative facts uniting the original and newly

asserted claims."). As explained below, however, Claim Five, like Diggs's other claims, lacks merit and will be dismissed.

### B.    Claim One

In Claim One, Diggs asserts that he received ineffective assistance of counsel in three ways:  because his attorney (a) coerced him to plead guilty rather than proceed to trial; (b) refused to file several motions to suppress evidence; and (c) filed an appeal based on issues barred by the plea into which Diggs agreed to enter.  (ECF No. 70 at 5.)  The Government asserts that these claims are without merit.  The Court agrees.

### 1.    Legal Standard

To demonstrate ineffective assistance of counsel, a convicted defendant must first show that counsel's representation was deficient, and second, that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To satisfy the deficient performance prong of *Strickland*, the convicted defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689).  The prejudice component requires a convicted defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.  In analyzing ineffective assistance of counsel claims, it is not necessary to determine whether counsel performed deficiently if the claim may readily be dismissed for lack of prejudice. *Id.* at 697.

In the context of a guilty plea, the Supreme Court has modified this second prong of *Strickland* to require the convicted defendant to "show that there is a reasonable probability that,

21

but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). Of course, in conducting the foregoing inquiry, the representations of the convicted defendant, his lawyer, and the prosecutor during the plea proceedings, "as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings." *Blackledge v. Allison*, 431 U.S. 63, 73–74 (1977). In light of the strong presumption of verity that attaches to a petitioner's declarations during his plea proceedings, "in the absence of extraordinary circumstances, allegations in a § 2255 motion that directly contradict the petitioner's sworn statements made during a properly conducted Rule 11 colloquy are always 'palpably incredible' and 'patently frivolous or false.'" *United States v. Lemaster*, 403 F.3d 216, 221 (4th Cir. 2005) (citations omitted). Thus, the Fourth Circuit has admonished that "in the absence of extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established, and a district court should, without holding an evidentiary hearing, dismiss any § 2255 motion that necessarily relies on allegations that contradict the sworn statements." *Id.* at 221–22. No circumstances exist here that would lead the Court to consider Diggs's prior sworn statements other than truthful.

### 2.      Claim One (a)

Claim One (a) — in which Diggs asserts that his attorney coerced him to plead guilty rather than proceed to trial — lacks merit, because Diggs himself attested at the Rule 11 hearing that no such thing happened. Indeed, at that hearing, Diggs clearly stated that no one had threatened or pressured him into pleading guilty and that, ultimately, it was his decision to do so. (ECF No. 59 at 12–13.) Diggs's claim is palpably incredible in light of these statements, which he made under oath, and Claim One (a) will therefore be DISMISSED. *See Lemaster*, 403 F.3d

22

at 221–22 (observing that, "in the absence of extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established, and a district court should, without holding an evidentiary hearing, dismiss any § 2255 motion that necessarily relies on allegations that contradict the sworn statements.")

### 3.    Claim One (b)

In Claim One (b), Diggs asserts that his attorney rendered ineffective assistance by failing to file several motions to suppress evidence, namely a "key statement by a FBI agent" and "a 911 call that was hear-say." (ECF No. 70 at 5.) But here, once more, Diggs's statements at the Rule 11 hearing belie this assertion. At that hearing, when asked whether Mr. Everhart did "everything [Diggs] wanted him to do," Diggs responded, "Yes, sir." (ECF No. 59 at 19.) And if this were not enough, Diggs also fails to identify with the requisite specificity the contents of the statements that he believes should have been suppressed. In other words, not only is Diggs's claim rendered incredible by his prior statements, but the claim is also too vague and speculative to warrant granting relief. *See United States v. Dyess*, 730 F.3d 354, 359 (4th Cir. 2013) ("[V]ague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the [d]istrict [c]ourt." (quoting *United States v. Thomas*, 221 F.3d 430, 437 (3d Cir. 2000))). Claim One (b) will therefore be DISMISSED.

### 4.    Claim One (c)

In Claim One (c), Diggs asserts that his attorney rendered ineffective assistance by filing a direct appeal based on issues his Plea Agreement barred him from raising. (*See* ECF No. 70 at 5.) Even to the extent that Diggs had not waived his right to appeal — a condition of the Plea Agreement made clear in the document itself and a decision Diggs made consciously after thorough explanation by the Court at the Rule 11 hearing — he does not identify what argument

23

or arguments he would have liked his attorney to have raised on appeal, and his claim is therefore too vague and speculative to warrant relief. *See Dyess*, 730 F.3d at 359. Claim One (c) will therefore be DISMISSED.

C.    **Claims Two and Five**

As discussed above, Claims Two and Five are difficult to distinguish from one another. In each, Diggs essentially asserts that 18 U.S.C. § 922(g)(1) is unconstitutional and violative of his rights under the Second Amendment. (ECF No. 70 at 6; ECF No. 76 at 3.) Claim Two faults the Court for denying a motion to dismiss the Indictment, (ECF No. 70 at 6), while Claim Five casts the blame on Congress in its enactment of the statute. (ECF No. 76 at 3.)

Neither claim requires significant discussion, as the United States Court of Appeals for the Fourth Circuit has explicitly held that § 922(g)(1) *is* constitutional under the test set forth in *New York State Rifle & Pistol Assoc., Inc. v. Bruen*, 597 U.S. 1 (2022). *See United States v. Hunt*, 123 F.4th 697, 702 (4th Cir. 2024) (rejecting *Bruen*-based challenge to § 922(g)); *United States v. Jacobs*, No. 24-4287, 2026 WL 157115 (4th Cir. Jan. 21, 2026) (no impact)). Accordingly, the Court did not err in denying Diggs's Motion to Dismiss and did not lack jurisdiction over Diggs. Claims Two and Five will accordingly be DISMISSED.

D.    **Claim Three**

In Claim Three, Diggs argues that the Court violated his due process rights by "imposing a sentence that is longer than necessary to achieve the goals of 18 U.S.C. § 3553" by "denying a well deserved downward variance, and granting an upward variance." (ECF No. 70 at 8.) Diggs further argues that "[t]he Court's decision to grant the upward variance f[ound] no support in the evidence presented." (*Id.*)

24

This claim is procedurally defaulted, because Diggs could have raised, but did not raise, this claim on direct appeal. *See Bousley v. United States*; 523 U.S. 614, 622–23 (1998); *United States v. Linder*, 552 F.3d 391, 397 (4th Cir. 2009) (internal quotation marks omitted) (citation omitted) (explaining that a petitioner who waives the right to appeal "is not precluded from filing a petition for collateral review. But he is precluded from raising claims that are the sort that could have been raised on appeal."). Thus, Claim Three is barred from review here.

Even if this were not the case, "[t]he language of § 2255 makes clear that not every alleged sentencing error can be corrected on collateral review. The Supreme Court has instructed that only those errors presenting a 'fundamental defect which inherently results in a complete miscarriage of justice' are cognizable." *United States v. Foote*, 784 F.3d 931, 932 (4th Cir. 2015) (quoting *Davis v. United States*, 417 U.S. 333, 346 (1974)). Here, the Court explained at length the reasons it believed imposing a variant sentence was appropriate, citing to undisputed facts Diggs agreed to in the Statement of Facts. (*See* ECF No. 60 at 24–26.) The § 2255 Motion does not address this fact, let alone take issue with any of the Court's stated reasons for its decision. Accordingly, in the alternative, Diggs fails to demonstrate that his sentence was defective, much less fundamentally so. Claim Three will therefore be DISMISSED.

### E.    Claim Four

Finally, in Claim Four, Diggs asserts that his plea was "defective" because he "took medications that altered [his] decision making." (ECF No. 70 at 9.) As an initial matter, this claim, like Claim Three, is procedurally defaulted, because Diggs could have raised, but did not raise, the claim on direct appeal. *See Bousley*, 523 U.S. at 622–23. Thus, Claim Three is barred from review here.

Even if the claim were not barred, it would not entitle Diggs to relief. It appears that Diggs's argument amounts to one that his plea was involuntary and/or unknowing. To the extent that this is indeed the basis of Diggs's claim, the claim is meritless. "For medication to render a defendant incompetent, his mental faculties must have been so impaired that he was 'incapable of full understanding and appreciation of the charges against him, of comprehending his constitutional rights, and of realizing the consequences of his plea.'" *United States v. Shiflett*, 258 F. App'x 560, 562 (4th Cir. Dec. 20, 2007) (quoting *United States v. Truglio*, 493 F.2d 574, 578–79 (4th Cir. 1974)). When informed that a defendant may be under the influence of medication, a court must inquire into the defendant's competence to plead guilty. *Id.* (citing *United States v. Damon*, 191 F.3d 561, 564 (4th Cir. 1999)). If a defendant's answers raise a "red flag" as to his mental state, the court must "expand its inquiry to ensure that the plea is being made knowingly and voluntarily." *Id.* (citing *Damon*, 191 F.3d at 565).

Here, after Diggs informed the Court that he had taken prescription medication before the Rule 11 hearing, the Court conducted the requisite inquiry into Diggs's competence, assessing any impact that the medication may have had on Diggs. Far from raising "red flags," however, Diggs's responses to the Court's questions suggested that the medication in question merely stabilized his mood and had no impact on his ability to understand either the Court or his attorney. (ECF No. 59 at 8–9.) Diggs's attorney corroborated this position, confirming that, based on interactions in several meetings, he believed that Diggs was "competent and fully able to move forward." (*Id.* at 10.) Accordingly, there was no basis for the Court to reject Diggs's plea as unknowing or involuntary, and Diggs's argument is without merit. *See Shiflett*, 258 F. App'x at 563 (finding that, where there was "no indication from the Rule 11 colloquy that

26

Shiflett did not understand his rights or the charges against him, . . . the district court did not err in its inquiry regarding Shiflett's competence."). Claim Four will therefore be DISMISSED.

### III.    CONCLUSION

For the foregoing reasons, although Diggs's Motion to Amend (ECF No. 76) will be GRANTED, his § 2255 Motion (ECF No. 70) will be DENIED. The action will be DISMISSED. A certificate of appealability will be DENIED.

An appropriate Final Order will accompany this Memorandum Opinion.

Let the Clerk file a copy of the Memorandum Opinion electronically and send a copy to Diggs.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Date:  July 8, 2026